# Richmond

## WILLIAM LEE OWEN v. JOHN A. WADE, JR., ET AL.

April 22, 1946.

Record No. 3031.

Present, All the Justices.

The opinion states the case.

*Thomas H. Howerton* and *T. Nelson Parker*, for the appellant.

*Don P. Bagwell*, for the appellees.

SPRATLEY, J., delivered the opinion of the court.

William Lee Owen instituted this proceeding by filing a notice of motion for judgment against John A. Wade, Jr. and Mrs. John A. Wade, Jr., to recover $900 for the breach of an alleged contract. The principle of subrogation being involved in the claim, and the plaintiff having proceeded at law when he should have proceeded in equity, the cause was transferred to the equity side of the court. Virginia Code, 1942 (Michie), section 6084. The plaintiff amended his pleading by filing a bill in equity.

The defendants answered. They denied the material allegations of the bill, and specifically averred that an accord and satisfaction had been reached and executed between the parties settling all matters in dispute between them.

The evidence was heard *ore tenus* before the chancellor. The plaintiff was held not entitled to any relief, and the bill was dismissed.

The facts, stated from the standpoint of the defendants, are without material conflict.

William Lee Owen, the plaintiff, is a timber broker, operating in North Carolina and Virginia. John A. Wade, Jr., is a farmer, a resident of Halifax county, Virginia. He owned a farm in that county of 565 acres, upon which there was valuable growing timber.

In October 1943, Owen conferred with Wade at the latter's home with reference to the purchase of the timber located on his farm. He made four or five trips to estimate the quantity of the timber and appraise its value. He told Wade that there was between 375,000 and 400,000 feet, worth between $2500 and $3000, and that any one who paid more than $3250 for it could not make any profit on his purchase. During the course of their negotiations, Wade told Owen that the real estate and the timber were encumbered by a deed of trust in favor of the Federal Land Bank of Baltimore, Maryland, in the amount of approximately $5600, and that any understanding reached between them as to the sale of the timber would have to be subject to the approval of the land bank, which customarily approved or disapproved such timber sales before releasing its liens.

On October 21, 1943, Wade and his wife gave Owen a sixty-day option, in writing, on the timber at the price of $3250, the timber to be cut and removed from the premises within three years. The option was on a printed form furnished by Owen. Wade says that he, then, again specifically informed Owen that the sale was contingent upon the approval of the purchase price by the Federal Land Bank. No copy of the option was kept by Wade or his wife. It was not under seal, and there was no consideration paid for its execution.

On or about December 15, 1943, Owen again visited Wade's farm, and asked for an extension of the option. He told Wade that the timber would not bring more than $3500; but that he would give him $3350 if he would extend the option for six months. Wade agreed to this, and there-

upon Owen produced the original printed option and changed the time thereon from two months to six months and the purchase price from $3250 to $3350. Mrs. Wade was not consulted or informed. No consideration was paid, nor the new option again signed. Wade says it was also understood, at this time, that any sale of the timber was subject to the approval of the land bank.

On December 25th or 26th, Wade received a letter from Owen, postmarked December 20, 1943. As the letter had not been mailed to Wade's correct address, it reached him after the sixty days from the date stated in the original option. The letter purported to be an acceptance of Wade's offer to sell the timber for $3350, as set forth in the altered proposal of December 15th. The written option, however, provided for only three years in which to cut and remove the timber while the letter accepting the offer stated that the time was to be three and one-half years.

Wade thereafter went to the office of the Federal Land Bank in the town of South Boston, Virginia, and applied for a release of the timber so that he could sell it to Owen. On December 30, he wrote Owen that he had taken such a step.

On January 7, 1944, Owen and Wade met in South Boston. Owen inquired as to whether the release had been obtained, and Wade told him that it had not.

The local committee of the Federal Land Bank was then in session in South Boston. Owen requested Wade to give his attorneys a description of the boundaries of the place, so that they would have the necessary data to prepare a timber deed. This Wade did. Owen and Wade then went back to the office of the committee of the land bank. While they were waiting in an anteroom, the bank's committee discussed the approval or disapproval of the release of the timber to Owen for $3350. During the conference of the committee, one of its members, J. M. East, made known to Wade and the committee that Owen had sold, or agreed to sell, the timber that he was purchasing to G. B. Short and Son for

$5500. Howard Dodson, a member of the committee and its timber appraiser, stated that he had appraised the timber for the purpose of release at the price of $4250, and recommended that amount as the minimum figure for release of the bank's lien. Acting on this, the committee decided that it would not release the timber for less than $4250. The committee advised Wade of their decision, and Wade stated that he would not sell the timber for less than the amount approved for release of the lien. Owen was then called in and was informed of the decision of the committee. Wade also told him that he would not sell for less than $4250, his agreement being based on the bank's approval of the sale price.

After some discussion, Owen asked Wade if he would give him three and one-half years to cut the timber instead of three years, if he paid him $4250 for it. Wade said that he would.

Owen then asked if Wade and the local committee would undertake to secure an immediate release from the Federal Land Bank, so that he could consummate the deal forthwith, and begin cutting the timber immediately. This was agreed to. A telephone call was made to the main office of the Federal Land Bank in Baltimore, Maryland, and its approval was thereby secured.

In the presence of the committee, both Owen and Wade were asked whether the ararngements for the sale of the timber at the price of $4250 was satisfactory to each of them. Wade's answer was "Yes, sir." Owen said "I guess it will have to be." Owen then stated that he would have his attorneys prepare the deed for $4250, and leave it with the committee in escrow, after execution by Wade and his wife, and if he did not have the money in the hands of the committee by the following Monday, the deed could be destroyed. The several parties present, except Owen, agreed that the sale for $4250 was in full and final settlement of the controversy between Owen and Wade.

The deed was prepared by Owen's attorneys, who were advised by their client that the consideration was $4250.

Owen later that day brought it to the office of the committee of the land bank. It was there read over by all of the parties, including Mrs. Wade and the representatives of the land bank.

The deed was different in form and contents from the original offer of sale made by Wade in the following respects: It provided for three years and six months in which to cut and remove the timber instead of three years. The grantees were named as G. B. Short and W. T. Short instead of William Lee Owen. The grantees were given the right to remove from the land any buildings that were constructed on the real estate, whereas the original offer contained no such stipulation. Both Owen and Wade were each asked if its terms and provisions were satisfactory to them. Each stated that they were. The deed was then executed and delivered by the Wades, and the $4250 was, by direction of Wade, paid by Owen to the Federal Land Bank, and a release of its lien executed by the bank.

G. B. Short, one of the purchasers of the timber from Owen, testified that he estimated there were about 700,000 feet of timber on Wade's farm. Another witness, a timber appraiser, estimated it as 780,000 feet and worth around $6000.

About a week or two after January 7, 1944, Wade met Owen in South Boston and during a conversation which they had at that time, Owen expressed no dissatisfaction with the sale. Subsequently, Owen wrote Wade that since the former had originally agreed to sell the timber to him for $3350, and he had been forced to pay $4250, he demanded the return of $900. Upon Wade's refusal to comply, these proceedings were instituted.

The defendants contend that the decree of the trial court was justified on four grounds: First, that there was no valid or enforceable contract between the parties prior to January 7, 1944; second, that the original offer to sell was based upon the condition that the sale price must be approved by the Federal Land Bank; third, that the plaintiff was guilty of fraud and deception; and fourth, that a valid and binding accord and satisfaction was had and executed

by the parties at the time the deed was executed, delivered, and accepted.

It is unnecessary to discuss the first three defenses. The fourth is determinative of the controversy.

" 'Accord is a satisfaction agreed upon between the party injuring and the party injured, which, *when performed,* is a bar to all actions upon the same account.' 3rd Bl. Com. 315." *Rorer Iron Co.* v. *Trout,* 83 Va. 397, 410, 2 S. E. 713, 5 Am. St. Rep. 285.

"However, it seems from the various applications of the doctrine of accord and satisfaction that it might more properly be said that accord and satisfaction is a method of discharging a contract, or settling a cause of action arising either from a contract or a tort, by substituting for such contract or cause of action an agreement for the satisfaction thereof and an execution of such substituted agreement." 1 Am. Jur., Accord and Satisfaction, section 1, p. 215.

"Accord and satisfaction is a method of discharging a contract or cause of action, whereby the parties agree to give and accept something in settlement of the claim or demand of the one against the other, and perform such agreement, the 'accord' being the agreement and the 'satisfaction' its execution or performance." 1 C. J. S., Accord and Satisfaction, section 1.

A mere protest, one without stating any condition, will not prevent a transaction from constituting a good accord when the other party insists that it must be accepted in full payment or not at all. 1 Am. Jur., Accord and Satisfaction, section 26; 1 C. J. S., Accord and Satisfaction, section 34.

Any unliquidated or disputed claim may be settled upon any terms or at any price agreed upon between the interested parties, under established rules of both law and equity.

The evidence fully discloses all of the elements of accord and satisfaction. The necessity for the final agreement presupposed a dispute between the parties. The execution and delivery of the deed containing the new conditions

to the substituted grantee were in full satisfaction of the demands of the plaintiff. It was a performance expressly accepted by the plaintiff, without condition, in pursuance of his agreement. Even if there had been a valid and binding pre-existing contract, the new agreement was substituted for and was in discharge of the dispute over its terms. An honest dispute, though not necessarily well founded, may be the basis of an accord. There were other and different considerations to support the new agreement. The final contract between the parties was agreed upon and consummated on January 7, 1944. Its performance settled all matters in dispute.

The facts and the law fully justify the decree appealed from. It is, therefore, affirmed.

*Affirmed.*