## Richmond

### JOAN E. WRIGHT, ET AL. V. THOMAS WALTER ORLOWSKI, ET AL.

June 10, 1977.
Record No. 760892.
Present: All the Justices.

*Wayne Lustig (Campbell, Lustig & Hancock,* on brief), for plaintiffs in error.

*John B. Preston (Donnell P. Davis; Charles A. McDuffie; William B. Smith; James A. Gorry, III; John F. Rixey; Preston, Preston, Wilson & Lambert; Furniss, Davis, Phelps and Rashkind; Guy, Cromwell, Betz, Smith & Dickerson; Broyles & Gorry; Rixey & Heilig,* on briefs), for defendants in error.

No brief for Edward Joseph Hendrix and Victoria A. Simon, defendants in error.

POFF, J., delivered the opinion of the Court.

This is an appeal from a final order sustaining pleas filed by defendants alleging that they were released by accord and satisfaction consummated by plaintiffs with certain joint tortfeasors acting through their insurers.

Edward R. Wright, a student at James Barry-Robinson Home for Boys, suffered multiple injuries which left him a quadriplegic. His injuries were sustained during a "hazing" incident when he was thrown from a classroom window by fellow students. On September 18, 1972, two motions for judgment (later amended) were filed against the several defendants listed in the margin.* Suing in her own right, Joan E. Wright, Edward's mother, sought damages in the sum of

---

*Thomas Walter Orlowski, Edward Joseph Hendrix, Richard H. McCrea, Jr., Conrad J. Landry, Mark Dombrowski, Victoria A. Simon, Franciscan Friars, Third Order Regular, T. David Fitz-Gibbon, John Joseph Baecher, Evelyn W. Perry, Executrix of the Estate of Thomas E. McAndrews, James J. Gara, Norman P. Moore, Executor of the Estate of Harry P. Moore, Jr., and the Board of Trustees, James Barry-Robinson Home for Boys.

$650,000. Suing as next friend of her minor son, she claimed damages of $2,000,000. During the pendency of the litigation and after the son had attained his majority, he and his mother entered into a written agreement with Government Employees Insurance Company (GEICO) which had issued a "homeowner's insurance policy" to the parents of Thomas Walter Orlowski, one of the named defendants.

The agreement provided that, in consideration of the payment of $25,000 (representing the maximum coverage under the policy), the Wrights "do hereby now and forever covenant and agree not to sue [GEICO] and to refrain forever from instituting . . . suits and proceedings of any kind . . . which the [Wrights] ever had, now have, or may have against [GEICO]". It was expressly agreed that "this instrument is not intended nor in fact is a release or discharge of nor an accord or satisfaction with any person whomsoever", and the Wrights reserved "the right to proceed against Thomas Walter Orlowski and any other person or persons against whom they may have or assert any claim".

Under a contemporary but separate agreement between the Orlowskis and GEICO, the Orlowskis authorized their insurer to "tender the full $25,000 coverage . . . in settlement of all claims . . . [the Wrights] may have now or in the future, known or unknown, against . . . the insurer of Thomas Walter Orlowski, or any of us" and agreed that, upon acceptance of the tender, GEICO "shall then and there be released of any further obligation under the policy contract or otherwise to pay any further sum whatever, or to further defend Thomas Walter Orlowski or any of us".

The parents of Edward Joseph Hendrix, another defendant, were insured under a "homeowner's policy" issued by Stuyvesant Insurance Company (Stuyvesant). The Wrights signed an agreement with Stuyvesant substantially the same as the Wright-GEICO agreement and the Hendrixs and Stuyvesant executed an agreement similar in all material respects to the Orlowski-GEICO agreement.

GEICO and Stuyvesant each issued a check in the sum of $25,000 payable to the Wrights and their attorney. The checks were endorsed and cashed and, after deduction of an agreed attorney's fee, the proceeds were accepted by the Wrights.

Invoking the rule that an accord and satisfaction with one tortfeasor releases all joint tortfeasors, the several defendants

filed various pleas of release and motions to dismiss. Pending decision, the trial court heard the testimony of the attorneys who negotiated the agreements and prepared the documents. John Carroll Fears, Jr., was employed by GEICO to represent its interests and to defend its insured, Orlowski. Orlowski was also represented under personal contract by James A. Gorry, III, who did not testify. Prior to the execution of the several agreements, Fears had a discussion with Wayne Lustig, counsel for plaintiffs. Concerning that discussion, Fears testified as follows:

"Q. And what did [Lustig] say he would do?

"A. He advised me that he would nonsuit the case as to Mr. Orlowski prior to the time it went to the jury.

". . . .

"Q. And as counsel for the insurance company and Orlowski, did you so advise Mr. Gorry in writing of that understanding with Mr. Lustig?

"A. Yes, I did, sir.

"Q. And have you and Mr. Lustig had any further discussions on the subject to the contrary that that would not — did you subsequently have any conversations that he would not nonsuit Orlowski in these cases?

"A. I don't recall any at the moment."

The letter to Gorry mentioned in Fears' testimony read in part as follows:

"I am still trying to get this matter resolved between Mr. Orlowski and the Wrights.

". . . .

"If the revised agreement is entered into between the Orlowskis and GEICO, then upon payment his clients will execute a Covenant Not to Sue running to the benefit of GEICO only. Mr. Orlowski would remain a defendant. However, he [Lustig] will take a non-suit as to Mr. Orlowski before the case is submitted to the jury. This same agreement is being entered into with Bob Winters' client [Hendrix]. In this way the plaintiffs could get the money immediately and still proceed against the other defendants.

"As previously discussed, this would mean that GEICO would be released of any further liability under the policy and

would not be requested to pay any further sums or to furnish Mr. Orlowski a defense from the date of payment of the money. On the other hand, it would relieve Mr. Orlowski of the exposure to a verdict for in excess of the policy limits."

Lustig did not testify, but on cross-examination, Fears acknowledged that Lustig had said, "I do not want to agree to this, but it is my intention to nonsuit the Orlowskis prior to the case going to the jury". He explained that "what I was trying to convey to Mr. Gorry ... was that after long dealings with Mr. Lustig in the past, I felt that if he stated that it was his intention to do it, then he would do it". Fears felt that the agreement to nonsuit "may have had some consideration so far as whether the Orlowskis executed the agreement".

Robert G. Winters, employed by Stuyvesant to represent its interests and to defend Hendrix, testified that he had discussed the question of a nonsuit with Lustig and with Fears and had advised Hendrix before the agreements were signed that "there might be a possibility that a nonsuit would be taken against him". Winters said that it was his "understanding" and "hope" that if Lustig "didn't find it detrimental to his client, he would take a nonsuit as to my client."

After the agreements were executed and the checks were issued and negotiated, Winters remained as counsel of record for Hendrix but, so far as the record shows, made no further appearance in the proceedings until called to testify.

Neither Hendrix nor his parents testified. The record does contain the deposition of Thomas Walter Orlowski. Although his testimony is somewhat vague, it appears that when he and his parents signed the agreement with Stuyvesant his impression was that he or his parents might be required to pay a portion of any verdict in excess of the insurance checks. Orlowski's parents did not testify.

In a written opinion dated February 18, 1976, the trial court noted that the written agreements contained a clause "expressly reserving the right to proceed against all defendants including Orlowski and Hendrix." However, the trial court found that "[d]espite the written agreement it appears that there was at least a tacit understanding between counsel for the plaintiffs and the two defendants that a non-suit would be taken as to the

two defendants before the case went to the jury." Based upon its written opinion, the trial court entered a final order on March 15, 1976 sustaining the pleas of release and awarding all defendants summary judgment.

■ Although courts elsewhere hold otherwise, this Court has consistently applied the strict common law rule that a release of one tortfeasor releases all joint tortfeasors. Our first definitive exposition is found in *Ruble* v. *Turner,* 12 Va. 38 (2 Hen. & M.) (1808). There, the plaintiff was a victim of an assault and battery committed jointly by several people. One of his assailants paid the expenses he had incurred during convalescence, and the plaintiff executed a document acknowledging that such payment "shall be satisfaction for the part he . . . took in [the] assault and battery"; the document also contained a proviso that "this shall not be considered as any satisfaction in favour of" the other tortfeasors. The principal question posed was "whether an accord with, and satisfaction received from, one joint trespasser, will, like a release, operate as a bar to a recovery against the other joint trespassers." *Id.* at 43. Equating "satisfaction" with a "valuable consideration in a deed [which] gives effect to the instrument", the Court answered the question in the affirmative. With respect to the effect of the proviso, the Court held that the plaintiff had no power "to change the law, in this particular, by any subsequent proviso or condition". *Id.* at 44.

From this early decision, several guiding principles emerged. It is a *release* which actuates the rule. The making of an *accord* and the acceptance of *satisfaction* will effect a release. When a tortfeasee accepts satisfaction from one tortfeasor *for the part he played* in the joint tort, that tortfeasor is released and his release operates to release all other tortfeasors. Finally, this is a rule of law, the operation of which the tortfeasee cannot defeat by a unilateral reservation of rights.

■ Plaintiffs acknowledge the rule in *Ruble* but contend that, since the covenant not to sue the insurer ran only to the covenantee and not to the insured-tortfeasor, the latter was not released and the rule was, therefore, never set in motion. They rely upon an analogy they see in *Lackey* v. *Brooks, Adm'r.,* 204 Va. 428, 132 S.E.2d 461 (1963). There, the lessor of a truck inserted in the lease a provision in the nature of a covenant not to sue the lessee for damage done to the truck by the lessee or his

employees. The truck was damaged by the negligence of an employee, and the lessor sued the employee. We held that, while a release of an employer for an act of negligence previously committed by his employee releases the employee as well, "a bare covenant not to sue the master for the tortious act of the servant is not a bar to an action against the servant for the latter's tortious conduct." *Id.* at 432, 132 S.E.2d at 465.

Plaintiffs' reliance is misplaced, for the analogy does not hold. It is true that in *Lackey,* the written covenant ran to the benefit of the master only, and here, the written covenant ran to the benefit of the insurer only. At that point, however, the analogy ends. The "bare covenant" in *Lackey* constituted the entire commitment; here, as we will demonstrate, the written covenant was not "bare", for it constituted but one part of a tripartite contract. The second part was the written agreement between the insured-tortfeasors and their insurers. The third part was what the trial court called a "tacit understanding" among counsel for the three contracting parties that plaintiffs would nonsuit the insured-tortfeasors before the case was submitted to the jury. In summary, there was neither accord nor satisfaction between the plaintiffs and the tortfeasor in *Lackey;* but in the case at bar, if the trial court's finding of a "tacit understanding" is supported by the evidence and if that understanding was part of the consideration supporting a tripartite contract, there was both accord and satisfaction between plaintiffs and the insured-tortfeasors.

> " 'Accord and satisfaction is a method of discharging a contract or cause of action, whereby the parties agree to give and accept something in settlement of the claim or demand of the one against the other, and perform such agreement, the "accord" being the agreement and the "satisfaction" its execution or performance. 1 C.J.S., Accord and Satisfaction, section 1.' " *Owen* v. *Wade,* 185 Va. 118, 124, 37 S.E.2d 759, 762 (1946).

We cannot say that the trial court's finding of a "tacit understanding" was "plainly wrong or without evidence to support it", Code § 8-491 (Repl. Vol. 1957), and we are of opinion that the evidence fully supports the conclusion that the three parties reached a mutual accord of which the "tacit understanding" was an integral part. Although plaintiffs never entered into a *written* contract directly with Orlowski and

Hendrix, it is clear that the three parties, acting through their attorneys, consummated a tripartite contract, the several commitments of which were mutually interdependent. Under that contract, it was agreed that the insurers, partly for the purpose of saving the expense of litigation, would pay plaintiffs the full amount of their potential liability as fixed in the policies of insurance and in consideration of such payment, plaintiffs would execute a written release of their right to sue the insurers. That portion of the agreement was to be authorized and ratified by the insureds' execution of a separate written agreement with their insurers. All parties knew that the insureds would derive no benefit from the consummation of the transaction between the insurers and plaintiffs, standing alone, which they did not already enjoy under their insurance policies. Obviously, then, the consideration which induced Orlowski and Hendrix to enter into the contract was the "tacit understanding" that, notwithstanding anything in the written instruments to the contrary, plaintiffs would abandon enforcement of personal liability against them. Hence, the "tacit understanding" was the linchpin of the tripartite contract.

■ Accord having been made, acceptance by plaintiffs of the satisfaction tendered in consideration of their covenant not to sue and their commitment to nonsuit constituted releases of Orlowski and Hendrix. "The satisfaction of the claim by the wrongdoer, and not the form of the instrument executed by the plaintiff, extinguished the claim of the latter." *Shortt* v. *Hudson Supply, Etc., Co.*, 191 Va. 306, 313, 60 S.E.2d 900, 904 (1950). The tort committed jointly by the several tortfeasors was a single tort, and it gave rise to a single, indivisible cause of action. Although the tortfeasors were liable jointly and severally, plaintiffs were "entitled to but one satisfaction for the same cause of action." *McLaughlin* v. *Siegel*, 166 Va. 374, 377, 185 S.E. 873, 874 (1936). We hold that when plaintiffs accepted the payments fixed in the tripartite contract, satisfaction for the tortious conduct of Orlowski and Hendrix was accepted, plaintiffs' cause of action was extinguished, and the other tortfeasors were released.

We agree with the trial court's observation that "counsel were acting in good faith in an attempt to avoid" application of the rule. But so was the draftsman of the proviso in *Ruble.* Unfortunately, the rule sometimes works harsh results. Yet, the

rule is one of ancient origin, honored without exception in this Commonwealth, and fully familiar to bench and bar. Both counsel and courts must be governed by it.

Finding no error below, we will affirm the final judgment.

*Affirmed.*